UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SAMUEL OREOLUWA ROBERTS,<br><br>Defendant. | 4:22-CR-40070-KES<br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Samuel Oreoluwa Roberts is before the court on an indictment charging him with interference with commerce by threats and violence and brandishing a firearm during a crime of violence.  See Docket No. 1.  Mr. Roberts has moved to suppress certain evidence.  See Docket No. 31.  The United States ("government") resists the motion.  See Docket No. 37.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and D.S.D. Local Rule 57.11.

## FACTS

An evidentiary hearing was held on February 16, 2023, in Sioux Falls, South Dakota.  Mr. Roberts was there in person along with his lawyer, Amanda Kippley, Assistant Federal Public Defender.  The government was represented

by its Assistant United States Attorney, Elizabeth Ebert. Four witnesses testified and seventeen exhibits were received into evidence. From this testimony and these exhibits, the court makes these findings of fact.

**A.     Pre-Arrest Investigation and First National Pawn Surveillance**

On the morning of March 29, 2022, Detective Tim Englund of the Sioux Falls Police Department was assigned a home burglary investigation that occurred late in the evening on March 28. Detective Englund testified that the victim reported a laptop, television, and some medications were stolen. The victim was able to provide Detective Englund the serial number of the stolen laptop computer. With this serial number, Detective Englund used a police department database called "Leads Online" to check local pawn shops in Sioux Falls to see if anyone reported buying a laptop with the same serial number. After using the system, Detective Englund testified that the stolen laptop had been pawned on March 29, 2022, at 10:53 a.m., at First National Pawn in Sioux Falls by an individual named Samuel Oreoluwa Roberts.

Detective Englund testified that he then researched Mr. Roberts in the Police Department's database and found that Mr. Roberts lived around ½ mile away from the victim's residence. Detective Englund also discovered that Mr. Roberts had recently been pulled over and received a traffic citation while driving a gold 2004 Pontiac Grand Am with a license plate of ▮▮▮▮▮▮.

Detective Englund testified that he then went to First National Pawn to retrieve internal and external surveillance footage of whoever pawned the stolen laptop. On First National Pawn's external surveillance camera, at 10:40 a.m.

2

on March 29, a gold Pontiac with a silver driver's side fender can be seen entering the parking lot. See Exhibit 3, 00:04; Exhibit 7. An African American male wearing a red hat, black sweatshirt and shorts, and blue shoes with white soles exited the vehicle and entered First National Pawn. Id. at 00:21. On the internal surveillance camera, the same individual can be seen selling the laptop to the pawn shop. Id. at 00:24; Exhibit 8, 9 & 10.[1] Again, this individual was identified through "Leads Online" as Samuel Oreoluwa Roberts.

**B.   Get N' Go Robbery**

On the evening of March 29, Sioux Falls Police Department officers were dispatched to a robbery at Get N' Go gas station in Sioux Falls. The reporting party stated that a black male walked behind the counter with his hand in his pocket, threatened the store employees, and took the money out of the register. Docket No. 43, p. 2 (Exhibit 1). The black male was reportedly wearing a blue ski mask and a red hoodie and was about 6'3" 175 lbs. Id. Detective Reiter was one of the responding officers. Id. at 1.

From Get N' Go's exterior surveillance camera, a gold car can be seen entering the parking lot, reversing around the corner, and parking near an exit. Exhibit 2, 00:00 – 01:05. Detective Reiter and Detective Englund both testified that they believed the car to be an early 2000's gold Pontiac, even with it being dark and raining outside. An individual can be seen on the exterior camera

---

[1] On First National Pawn's internal surveillance footage, the time appears to be 9:42 a.m., or one hour behind the external camera. Detective Englund testified that this was a system error, and the true time of these events was from 10:40 a.m. until 10:54 a.m. See Exhibit 3, 00:04 – 10:46.

3

exiting the vehicle and walking towards Get N' Go in a red hoodie, grey sweatpants, blue/grey shoes with white soles, black mask, orange reflective sunglasses, and grey gloves. Id. at 02:07-02:55. The individual appears to be an African American male. Id. at 02:56. Upon entering Get N' Go, the individual walked behind the counter with his hand in his pocket and grabbed one of the store employees. Id. at 03:21. The individual walked the employee to the register, took the money, and forced the employee to accompany him to the exit. Id. at 03:21-04:03. The individual can then be seen running back to the same gold vehicle. Id. at 04:10.

Detective Englund testified that he watched the Get N' Go robbery surveillance footage and believed the vehicle used in this robbery was the same vehicle in the First National Pawn Shop footage earlier that day on the 29th. Detective Englund also believed the same individual appeared in both places because they had matching shoes – blueish shoes with white soles. Detective Englund testified that after making these observations, he decided to email the entire Sioux Falls Police Department. This email, sent at 4:02 pm on March 30, stated:

> During the course of the day a suspect has been developed. The suspect is Samuel Oreoluwa Roberts . . . and his current address is ▮▮▮▮▮▮▮▮▮▮▮▮. Mr. Roberts is currently driving a 2004 Pont Grand Am gold in color(pictured below). The vehicle is currently registered and has a plate of ▮▮▮▮▮▮ but as you can see he is driving around with no plates. At this point I ask that you leave him alone if you see him out and about. I am close to establishing enough PC for a search warrant, which will probably occur tomorrow. Just keep this address and vehicle in mind in case there are any other robberies that occur before we can execute a search warrant.

Docket No. 43, p. 4 (Exhibit 4).

Detective Englund testified that he said he was "close to establishing enough [probable cause]" rather than saying he had probable cause because he wanted to avoid an ambitious officer going out to find Mr. Roberts and wanted to go home and avoid doing paperwork that evening. Detective Englund testified that he believed at that point he had enough probable cause but wanted to wait until the next day to conduct any searches or make an arrest.

Detective Reiter testified that he read Detective Englund's email at the start of his shift on March 30. After reading the email, Detective Reiter testified that he looked up Mr. Roberts in the police database, compared his appearance to the appearance of the individual who robbed the Get N' Go the evening prior, and noted Mr. Roberts' address in Sioux Falls. Officers Aaron Klein and Adam Neal also testified that they read and reviewed Detective Englund's email at the start of their shifts on March 30.

C.    **Kum N' Go Robbery and Search of Mr. Roberts' Vehicle**

At around 9:45 p.m. on March 30, the Sioux Falls Police Department received a call about a robbery at the Kum N' Go gas station in Sioux Falls. Docket No. 43, p. 10 (Exhibit 5). Some of the responding officers were Detective Reiter and Officers Klein and Neal. Id. at 11. The reporting party indicated that the assailant was a black male wearing a red jacket, blue ski mask, and drove a gold/tan Grand Prix.[2] Id. at 12. The reporting party also indicated that it sounded like the assailant cocked a gun in his jacket pocket.

---

[2] Like a Grand Am, a Grand Prix is a model of Pontiac.

Id. On the command log, an officer stated that this appeared to be the same description as the robbery that took place at "69/Louise," or the Get N' Go gas station the evening before. Id. Officer Neal testified that he called Detective Englund to keep him in the loop and told him that he believed the Kum N' Go robbery to also be Mr. Roberts' doing.

Detective Reiter testified that with this description, he reasonably believed that the suspect that robbed Kum N' Go was the same suspect from the previous evening's robbery at Get N' Go and from Detective Englund's email, but that now he may be armed. Detective Reiter testified that he then decided to drive to Mr. Roberts' known address to see if he would return home.

At around 9:52 p.m., less than 10 minutes after the police were notified of the Kum N' Go robbery, Detective Reiter spotted a gold Pontiac driving near Mr. Roberts' known address. Exhibit 6 (Body Camera Clip 1), 00:08.[3] Detective Reiter stated that the license plate was ▅▅▅▅, which matched Mr. Roberts' known license plate number. Id. at 00:18; see Docket No. 43, p. 4 (Exhibit 4). Detective Reiter testified that based on his observations of a gold Pontiac leaving the previous night's robbery at Get N' Go, the command log specifying that a gold Pontiac left the scene of the Kum N' Go robbery not even 10 minutes prior, and the information he reviewed from Detective Englund's department-wide email, he believed this car to be the suspect's vehicle and that there would be evidence of those crimes in the vehicle.

---

[3] This can also be seen on Defense Exhibit A at 01:12.

6

Detective Reiter followed behind the suspects vehicle and waited for additional officers to arrive before conducting a "high-risk" or "felony" traffic stop.[4]  Officers Klein and Neal arrived on scene and Detective Reiter initiated a traffic stop.  Id. at 00:44 – 01:10.  Detective Reiter got out of his vehicle, unholstered his weapon, and ordered the driver to shut his car off.  Id. at 01:20.  Then, Officer Klein ordered the driver to exit his vehicle, raise his hands, back towards them, and kneel on the ground.  Id. at 01:21-03:19; Exhibit D, 01:25-02:50.  The driver was then placed in handcuffs.  Id. at 03:21.  The driver immediately stated that there was a legal firearm in the vehicle and that it was not loaded.  Id.

Officer Klein asked if there was anyone else in the vehicle and the driver indicated there wasn't.  Exhibit D, 03:00.  Officers Klein and Neal then approached the vehicle to "clear" it for any other passengers or potential threats.  Id. at 04:30.  Detective Reiter and Officers Klein and Neal testified they were "clearing" the vehicle for officer safety purposes, not searching the vehicle.  All the officers testified that this was a standard practice during "high-risk" or "felony" traffic stops to ensure there were no other passengers or threats inside the vehicle.  During this clearing process, the officers spotted a

---

[4] Detective Reiter and Officers Klein and Neal testified that the reason for conducting the "high-risk" or "felony" traffic stop was because the reporting party from the Kum N' Go robbery indicated that the suspect may be armed. They all testified that in order to conduct one of these stops, officers will wait for backup before initiating the traffic stop, call the driver out of their vehicles and have them back up slowly towards them with their weapons drawn.

7

pistol magazine on the floorboard of the front passenger seat. Id. at 04:40. Officer Klein then opened the trunk to "clear" it. Id. at 05:00.

Detective Reiter brought the driver to his car and informed him he was being detained for a criminal investigation and was not free to leave. Exhibit A, 06:49. Detective Reiter conveyed to the driver that he matched the description, vehicle, and license plate of a suspect. Id. The driver refused to provide Detective Reiter his name and stated that he wanted to speak with a lawyer. Id. at 07:15; Exhibit 6 (Body Cam Clip 2) at 00:13.

After the vehicle was cleared, Officer Neal stated, "Do we just want to hold it for a warrant? I don't want to mess with it." Exhibit 6 (Body Cam Clip 2) at 00:41. Detective Reiter then stated he "is going to let a supervisor tell us what they want done with it." Id. at 00:45. Officer Reiter stated that he recognized the vehicle immediately because the vehicle's license plate matched the license plate in Detective Englund's email earlier that day. Id. at 00:54. Officer Neal testified he then called Detective Englund again to report that they saw a pistol magazine in the car and the suspect and vehicle matched Detective Englund's intel. All the officers at the scene testified that they believed they had probable cause to search the vehicle but wanted to call Detective Englund to avoid stepping on his toes or interfering with his investigation. Officer Neal testified that he received the go-ahead from Detective Englund and Mr. Roberts' vehicle was searched. In the vehicle, officers found a firearm, magazine, and various clothing items that matched the clothes the suspect wore in both gas station robberies.

Mr. Roberts was arrested and later charged with two counts of interference with commerce by threats and violence and two counts of brandishing a firearm during a federal crime of violence. See Docket No. 1. Now Mr. Roberts moves to suppress the evidence found during this traffic stop, arguing the officers did not have probable cause to search his vehicle without a warrant. See Docket Nos. 31 & 32.

## DISCUSSION

### A.  Whether the Search of Mr. Roberts' Vehicle Violated the Fourth Amendment

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The usual rule under the Fourth Amendment is that a valid search warrant supported by probable cause must first be obtained before a search is conducted. California v. Carney, 471 U.S. 386, 390 (1985). But, there are several exceptions to the warrant requirement, one being the "automobile exception." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam); United States v. Caves, 890 F.2d 87, 89 (8th Cir. 1989).

The Supreme Court has held that the "ready mobility" of automobiles creates an exigency that allows a warrantless search of an automobile where probable cause exists to believe that the vehicle contains contraband or evidence of criminal activity. Labron, 518 U.S. at 940; Caves, 890 F.2d at 89. Aside from the mobility of cars, the automobile exception to the warrant requirement is also supported by the fact that citizens have a reduced

9

expectation of privacy in an automobile because automobiles are subject to pervasive regulations.  Labron, 518 U.S. at 940 (citing Carney, 471 U.S. at 390-391); Caves, 890 F.2d at 89.  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Soderman, 983 F.3d 369, 375 (8th Cir. 2020) (quoting United States v. Murillo-Salgado, 854 F.3d 407, 418 (8th Cir. 2017)).

If probable cause exists in support of the automobile exception, the search may encompass the entire passenger compartment of the automobile, its trunk, and all containers, packages, and compartments located in the vehicle so long as there is probable cause to believe that the object of the search may be found there.  Caves, 890 F.2d at 90.  Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity."  United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (citing United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997) (quoting Illinois v. Gates, 462 U.S. 213, 243-244 n. 13 (1983)).  When a search takes place without a warrant, the burden is on the government to demonstrate by a preponderance of the evidence that one of the exceptions to the warrant requirements applies.  Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005).

Mr. Roberts argues that while he told officers there was a firearm in the vehicle, the officers did not have any information on whether he was legally allowed to possess a firearm, and thus "the incriminating character [was] not

10

immediately apparent." Docket No. 32, pp. 4-5 (quoting United States v. Lewis, 864 F.3d 937, 944 (2017).  Mr. Roberts asserts there was no probable cause to search the vehicle absent a warrant.  Id. at 5.  The court disagrees.

The incriminating character of Mr. Roberts' gun was immediately apparent to Detective Reiter and Officer Klein.  "An item's incriminatory nature is immediately apparent if the officer at that moment had probable cause to associate the property with criminal activity."  Lewis, 864 F.3d at 944 (quoting United States v. Craddock, 841 F.3d 756, 759 (8th Cir. 2016) (internal quotations omitted).  Less than ten minutes before the traffic stop on March 30, a reporting party at the Kum N' Go gas station robbery stated that they had heard the assailant cock a gun during the commission of the crime.  Docket No. 43, p. 12 (Exhibit 5).  The assailant was reported driving away in a gold/tan Pontiac.  Id. Soon after, Detective Reiter spotted a gold Pontiac driving near Mr. Roberts' known address.  Thus, whether officers had any information on whether Mr. Roberts could legally possess a firearm is irrelevant—Detective Reiter and Officer Klein had probable cause, through Mr. Roberts' voluntary statement that there was a weapon in the vehicle, to believe that the weapon potentially used during the commission of the Kum N' Go robbery was in the vehicle.  Further, when "clearing" the vehicle after placing Mr. Roberts in a patrol car, officers spotted a gun magazine on the passenger side floorboard in plain view.

Beyond Mr. Roberts' statement that there was a weapon in the vehicle, Detective Reiter, Officer Klein, and Officer Neal had several other indicia of

probable cause to search the vehicle without a warrant. First, all the officers learned of a potential suspect of the March 29 Gas N' Go robbery through an email by Detective Englund. In this email, Detective Englund stated the suspect was Mr. Roberts and that he was driving a 2004 gold Pontiac. Docket No. 43, p. 4 (Exhibit 4). The Eighth Circuit has consistently held that the "collective knowledge doctrine imputes other officers' finding of probable cause to the arresting officer '[w]hen multiple officers are involved in an investigation' and 'as long as there is some degree of communication' among the officers." Furlow v. Belmar, 52 F.4th 393, 402 (8th Cir. 2022) (quoting United States v. Robinson, 664 F.3d 701, 703 (8th Cir. 2011). "When officers function as a search team, it is appropriate to judge probable cause upon the basis of their combined knowledge, because 'we presume that the officers have shared relevant knowledge which informs the decision to seize evidence or to detain a particular person.' " United States v. Banks, 514 F.3d 769, 776 (8th Cir. 2008) (quoting United States v. O'Connell, 841 F.2d 1408, 1419 (8th Cir. 1988)).

Detective Englund testified he had probable cause for a search warrant when he emailed the entire Sioux Falls Police Department. While Detective Englund stated in his email he was "close to establishing enough [probable cause]" rather than saying he had probable cause, Detective Englund explained he did this to prevent an over-ambitious police officer from going out that evening to get the arrest.

Detective Englund testified that he had determined that Mr. Roberts pawned the stolen laptop at First National Pawn, found that Mr. Roberts

12

recently received a traffic citation while driving a gold Pontiac with license plate ███████, and observed a gold Pontiac pull into the First National Pawn parking lot shortly before the stolen item was sold. Detective Englund also observed the individual who pawned the stolen laptop wearing blueish shoes with white soles. Detective Englund then observed the video footage of the Get N' Go robbery and testified that he believed the vehicle used was the same gold Pontiac from the pawn shop earlier that day and the assailant was wearing the same blue shoes with white soles. With this information, Detective Englund testified he believed that Mr. Roberts committed both crimes and believed he had probable cause for a search warrant. Detective Englund then conveyed this information by email to the Sioux Falls Police Department, including Detective Reiter and Officers Klein and Neal shortly before the Kum N' Go robbery on the evening of March 30. The court believes this communication is adequate to impute Detective Englund's finding of probable cause to Detective Reiter and Officers Klein and Neal.

But even without this email, Detective Reiter established his own probable cause to search Mr. Roberts' vehicle. Detective Reiter testified that he responded to the Get N' Go robbery on March 29 and had viewed their exterior and interior surveillance cameras. Detective Reiter testified he observed a gold Pontiac pull up to the Get N' Go gas station and a black male wearing a red hoodie, grey sweatpants, and blue shoes with white soles enter and rob the gas station.

The next day, Detective Reiter read Detective Englund's email naming Mr. Roberts as a potential suspect and mentally noted his vehicle and address, as it was in the part of Sioux Falls that he patrolled. Detective Reiter then observed the command log of the Kum N' Go robbery, which stated that the assailant was a black male wearing a red jacket, blue ski mask, and drove a gold/tan Pontiac, and believed this to be the same individual from the Gas N' Go robbery and from Detective Englund's email. Remembering Mr. Roberts' address, Detective Reiter drove towards his apartment and spotted a gold Pontiac with a matching license plate number from Detective Englund's email.

It is clear that "given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found" in Mr. Roberts' vehicle. Soderman, 983 F.3d at 375. Detective Reiter's observations of a gold Pontiac leaving the previous night's robbery at Get N' Go, the command log revealing that a gold Pontiac left the scene of the Kum N' Go robbery not even 10 minutes before the traffic stop, the information he reviewed from Detective Englund's department-wide email, and Detective Reiter spotting a gold Pontiac with a matching license plate near Mr. Roberts' known address is certainly enough to establish that Detective Reiter had probable cause to search Mr. Roberts' vehicle without a warrant.

Mr. Roberts rejects this conclusion by pointing to the officer's reluctance to search Mr. Roberts' vehicle before calling Detective Englund to argue that the officers on scene did not have probable cause to conduct the search. But all three officers, Detective Reiter, Officer Klein, and Officer Neal, indicated they

14

believed they had probable cause to search the vehicle. All three officers testified the reason they were reluctant to search the vehicle and decided to call Detective Englund because they did not want to interfere in his criminal investigation into Mr. Roberts. After giving Detective Englund a courtesy call and getting the go-ahead, the officers conducted a search. It is clear to the court given the totality of the circumstances and information known to the arresting officers that there was sufficient probable cause to search Mr. Roberts' vehicle without a warrant.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends DENYING Mr. Roberts' motion to suppress evidence [Docket No. 31] in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the

district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

    DATED this 2nd day of March, 2023.

                             BY THE COURT:

                             /s/ Veronica L. Duffy

                             VERONICA L. DUFFY
                             United States Magistrate Judge