UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SAMUEL OREOLUWA ROBERTS,<br><br>Defendant. | 4:22-CR-40070-KES<br><br>ORDER ADOPTING REPORT AND RECOMMENDATION AS MODIFIED AND DENYING ROBERTS' MOTION TO SUPPRESS |

Defendant, Samuel Oreoluwa Roberts, is charged with two counts of interference with commerce by threats and violence in violation of 18 U.S.C. § 1951 and two counts of brandishing a firearm during a federal crime of violence in violation of 18 U.S.C. § 9249(c)(1)(A)(ii). Docket 1. Roberts moves to suppress all evidence that law enforcement officers located during the search of his vehicle because he claims this search was not supported by probable cause. Docket 31.

The court referred Roberts' motion to a magistrate judge under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, the magistrate judge recommended denying Roberts' motion to suppress. Docket 46 at 15. Roberts filed objections to the Report and Recommendation. Docket 53. After a de novo review of the Report and Recommendation and the record, the court adopts the Report and Recommendation as modified below and denies Roberts' motion to suppress.

**LEGAL STANDARD**

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 59 of the Federal Rules of Criminal Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

**FACTS**

After a de novo review of the transcript of the evidentiary hearing and the exhibits received into evidence, the court makes the following factual findings:

Around 10:30 p.m. on March 29, 2022, the Sioux Falls police received a report of a robbery that had just occurred at a Get-n-Go gas station in Sioux Falls. Docket 43 at 1. One employee described the individual as a black male wearing a red hoodie and blue ski mask.[1] *Id.* at 2. Witnesses reported not

---

[1] The command log indicates that the first person to report the robbery described the individual as wearing a black hoodie and red mask. Docket 43 at 1-2. But the surveillance video confirms that it was a red hoodie and a dark-colored ski mask. *See id* at 6.

2

seeing any weapons, but they noted that the man had one hand in his pocket. *Id.* at 2. The man was also described as being approximately six feet and three inches tall and weighing 175 pounds. *Id.*

Then-patrol officer Justin Reiter was dispatched to this robbery. Docket 45 at 6-7. Reiter spoke with an employee at the scene who provided the same general description of the person who robbed them, adding that the ski mask was dark blue, and that he was also wearing reflective mirrored sunglasses, gray gloves, and blue shoes. *Id.* at 11.

Reiter then reviewed both exterior and interior surveillance cameras at the Get-n-Go. *Id.* On the exterior camera, Reiter observed "a lone male occupant," who was wearing "a red or orange hoodie," gray sweatpants, blue shoes, a dark ski mask, and reflective mirrored glasses exit a car that had parked behind the gas station and approach the front door of the gas station. *Id.* at 11-12; *see* Exhibit 2 at 01:57-02:54. After entering, Reiter observed from the interior camera that this individual walked behind the counter and took some money from either the clerk or directly from the register. Docket 45 at 12-13; *see* Exhibit 2 at 02:55-03:48. Back outside, the camera showed the suspect go back to the same car. Docket 45 at 13; *see* Exhibit 2 at 04:06-04:22. Despite the darkness and rain and the vehicle's distance from the camera, Reiter testified that he was able to identify the vehicle as a "tannish or gold-colored Pontiac" based on his own familiarity with that type of car and through a Google search. Docket 45 at 14, 25, 33; *see* Docket 43 at 8-9.

The next morning, the Get-n-Go robbery was assigned to Tim Englund, a property crimes detective with the Sioux Falls police. Docket 45 at 39-41. Englund reviewed reports from Reiter and another officer who responded, which included still photographs of the suspect and vehicle from the gas station's surveillance cameras. *Id.* at 41. That morning, Englund sent an email to all sworn police officers in the Sioux Falls Police Department informing them of the robbery and that the "clerk believes the subject was an African American male" who "never displayed a weapon but kept his hand in his hooded sweatshirt pocket like he had a firearm." Docket 43 at 5. Attached to this email were still photographs of the suspect entering the gas station and two still photographs of the suspect's vehicle. *Id.* at 6-9. After reading this email, another detective informed Englund that he thought the vehicle was a gold 2005 Pontiac Grand Am. Docket 45 at 52.

Around the same time, Englund was also assigned a reported apartment burglary that occurred overnight between March 28 and March 29. *Id.* at 42. The resident of the apartment reported that her laptop had been stolen. *Id.* at 43. Using the laptop's serial number and an online system called LeadsOnline, Englund learned that the laptop had been pawned by someone named Samuel Roberts at First National Pawn on March 29 around 10:50 a.m. *Id.* at 43-44. From this system, Englund also learned Roberts' date of birth and address. *Id.* at 44. Englund used this information to look up Roberts in a Sioux Falls Police Department database, from which he learned that Roberts had received a ticket in September 2021 while driving a gold 2004 Pontiac Grand Am. *Id.* at 44-45;

4

Docket 44 at 2. This database also included the license plate for the Pontiac Grand Am, an address, and old booking photos for Roberts. Docket 45 at 45.

Englund then went to National Pawn and reviewed surveillance footage, which showed a gold Pontiac Grand Am with a silver front driver's side fender and no front license plate pulling into the parking lot. *Id.* at 45-48; *see* Exhibit 3 at 00:01-00:12. An individual that Englund believed to be Roberts exited the vehicle, entered the pawn shop, and pawned the laptop. Docket 45 at 48-49; *see* Exhibit 3 at 00:13-00:30. Englund observed that Roberts was wearing "blue-greenish tennis shoes" with white soles. Docket 45 at 48; *see* Exhibit 3 at 04:57.

While Englund was at National Pawn, another detective retrieved additional surveillance footage from the Get-n-Go, which Englund later viewed. Docket 45 at 51. Englund testified that this camera "had a better camera [angle] of the vehicle" which allowed him to "see that it's the gold Grand Am that has a different colored front fender[.]"[2] *Id.* at 51. At this point, Englund determined that "[t]he vehicle that was used in the Get-n-Go robbery appear[ed] to be Mr. Roberts' vehicle. The shoes he's wearing when he pawns the computer, which was roughly 12 hours before the robbery, appeared to be the same shoes that the robbery suspect was wearing." *Id.* at 52.

---

[2] It is not clear from Englund's testimony if this surveillance footage is the same footage that was entered into evidence at the evidentiary hearing at Exhibit 2. From the court's review of Exhibit 2, it cannot say whether a silver front driver's side fender is visible on the video, or whether that is merely a reflection. *See* Exhibit 2 at 00:54-00:55.

5

Now that he had identified a suspect for the Get-n-Go robbery, Englund sent a follow-up email in which he identified Roberts as a suspect, stated that he was driving a gold 2004 Pontiac Grand Am, and provided his address and license plate number, while noting that he was currently driving "with no plates." Docket 43 at 4. The email also included the following instruction:

> At this point I ask that you leave him alone if you see him out and about. I am close to establishing enough [probable cause] for a search warrant, which will probably occur tomorrow. Just keep this address and vehicle in mind in case there are any other robberies that occur before we can execute a search warrant.

*Id.*

On direct examination, Englund explained that he included this instruction in his email because he did not want a "very ambitious officer" to "circle the neighborhood constantly in a marked patrol car" letting Roberts "know that we were on to him in case he would destroy evidence. We were going to do a search warrant the next day." Docket 45 at 53-54. On cross-examination, however, Englund disclosed for the first time that at the time he sent the follow-up email, he thought he had probable cause for a search warrant. *Id.* at 60. He explained that he said otherwise because "it's the end of [his] shift," and he "want[ed] to go home and not complete the search warrant" that night. *Id.*

When Reiter's shift started on March 30, he reviewed the email from Englund identifying Roberts as a suspect. *Id.* at 17-18. He then looked Roberts up in a police department system and compared Roberts' "appearance in his records jacket to what [he] had seen on the camera the day prior, the Get-n-Go

6

robbery, and [he] believed it to be a similar statured male, height- and weight-wise." *Id.* at 18-19. Reiter also took note of Roberts' address, which was in a part of Sioux Falls that Reiter patrolled. *Id.*

A few hours later, still on March 30, another robbery was reported, this time at a Kum & Go gas station. Docket 43 at 10. A witness reported that the suspect was a black male wearing a red jacket and blue ski mask who drove away in a gold or tan late model Grand Prix. *Id.* at 12. She also stated that it "sounded like he cocked a gun in his jacket." *Id.* Reiter saw all this information in real-time on his computer dispatch screen. Docket 45 at 20. He believed that the suspect and vehicle description matched the descriptions from the previous night's robbery and Englund's email, so he drove near Roberts' address to see if he could observe Roberts returning home. *Id.* at 21.

After waiting a few minutes, Reiter observed a gold Pontiac Grand Am driving eastbound on 46th Street. *Id.* at 22. After pulling behind the Grand Am, he noticed it had the license plate number included in Englund's email, and Reiter initiated a traffic stop. *Id.* Officer Aaron Klein was also present, and he ordered the driver out of the car. *Id.* at 23. Reiter handcuffed the driver, who told him that there was an unloaded, legal firearm in the car. *Id.* at 24, 30. Reiter asked the driver his name, but he responded by asking for an attorney. *Id.* at 24. Reiter testified that he identified the driver as Roberts based on photos of Roberts that he had previously viewed. *Id.* at 26. While Reiter was handcuffing Roberts and placing him in the back of his vehicle, Officer Klein and Officer Adam Neal "cleared" the car to ensure there were no other people in

7

the car. *See id.* at 94-95; Exhibit 13 at 00:01-00:43. In clearing the vehicle, officers saw at least one pistol magazine in plain view. Docket 45 at 30, 36, 95; Exhibit 13 at 00:17-00:19.

The officers then had a discussion regarding whether they should search the car immediately or "hold it for a warrant." Exhibit 6, BW Clip 2 at 00:40-00:55. Neal said he did not think they "should mess with it." *Id.* at 00:41-00:42. Another officer agreed. *Id.* at 00:42-00:43. Klein told Neal to call Englund to find out what Englund wanted them to do. *Id.* at 00:43-00:47. Neal said that he did not know if Englund wanted them to search the car there or tow it. *Id.* at 00:47-00:50. Neal then called Englund, and after speaking with him for a few moments, he gave a thumbs-up to the other officers, indicating that they should search the car. *Id.* at 00:50-01:07.[3] The officers then searched Roberts' vehicle and found a bag of cash, a firearm, a few magazines, and clothing that matched that worn by the suspect in both robberies. *See* Exhibit A at 09:10-10:47; Exhibit D at 07:17-09:27.

## DISCUSSION

### I. Roberts' Factual Objections Are Sustained

Roberts makes three objections to the factual conclusions in the Report and Recommendation. Each factual objection is sustained.

---

[3] Only portions of Neal's side of this phone conversation are audible on videos from other officers' body cameras. *See* Exhibit 6, BW Clip 2 at 00:50-01:07. Neal testified that because the vehicle stop occurred near the end of his shift, his body camera had died, and he did not have a charger for it. Docket 45 at 100. Neal did not write a report because he believed "there was nothing [he] did that was not inclusive of another officer being present." *Id.* at 105.

8

### A. Reiter Did Not Respond to the Scene of the Kum & Go Robbery

Roberts objects to the magistrate judge's "factual conclusion that Detective Reiter was a responding officer to the Kum [&] Go robbery on March 30, 2022." Docket 53 at 2 (citing Docket 46 at 5). According to Roberts, this "is relevant because Detective Reiter did not possess firsthand knowledge of the robbery on March 30th: rather, his awareness of the facts was limited to what he read on the Metro Communications log." *Id.*

It is not clear whether the Report and Recommendation's reference to Reiter as one of the "responding" officers to the Kum & Go robbery means that he responded by going to the scene of the robbery, or only that Reiter was involved in the overall response to the robbery, which includes the vehicle stop. *See* Docket 46 at 5. If the former, that is plainly contradicted by Reiter's own testimony. Docket 45 at 20-21. Reiter testified that after reading information about the suspect in the Kum & Go robbery on the command log, he drove to the area near Roberts' address. *Id.* Thus, the objection is sustained, and the Report and Recommendation is modified to clarify that Reiter did not respond to the scene of the Kum & Go robbery, and that any information he learned about the Kum & Go robbery was not learned firsthand.

### B. Reiter Did Not Testify That He Believed There Would Be Evidence of the Gas Station Robberies in Roberts' Vehicle

Roberts objects to the "the factual conclusion that Detective Reiter testified that he believed there would be evidence of the crimes related to the [Get-n-Go] and Kum & Go robberies in the vehicle." Docket 53 at 2 (citing Docket 46 at 6). Reiter testified that he was waiting near Roberts' address "in

9

case . . . [he] observed [Roberts] or the vehicle returning home" after the Kum & Go robbery. Docket 45 at 21. He also testified that he "observed the vehicle that matched the description of both robberies driving past [him] with the license plate put out by Detective Englund." *Id.* at 26. But he never testified that "he believed . . . that there would be evidence of [the gas station robberies] in the vehicle." Docket 46 at 6. Thus, this objection is sustained, and the Report and Recommendation is modified to reflect that Reiter did not provide such testimony.

### C. Reiter Did Not Testify That He Believed They Had Probable Cause to Search the Vehicle

Roberts "objects to the factual conclusion that '[a]ll the officers at the scene testified that they believed they had probable cause to search the vehicle but wanted to call Detective Englund to avoid stepping on his toes or interfering with his investigation.' " Docket 53 at 2 (alteration in original) (quoting Docket 46 at 8). Specifically, Roberts claims that although Reiter "explained that the conversation between the officers regarding a search was focused on whether they 'should' search the vehicle, he never explicitly testified that he believed they had probable cause to search the vehicle." *Id.* at 2-3.

Reiter testified that the conversation among the officers was about whether they *should* search the vehicle, given concerns about "step[ping] on the feet of a detective that's already in the investigation[,]" not whether they *could* search the vehicle. Docket 45 at 27. It can be inferred from Reiter's testimony that he believed they could search the vehicle because they had probable cause, and such an inference would align with Officer Klein's testimony about

10

this conversation. *Id.* at 76 ("I believe that the discussion was that it could be searched based on the probable cause[.]"). But Roberts is correct that Reiter never "explicitly" testified that he believed they had probable cause. Thus, this objection is sustained, and the Report and Recommendation is modified as such.

## II. Roberts' Objections to Legal Conclusions

The magistrate judge found that the officers had probable cause to search Roberts' vehicle because Englund communicated his finding of probable cause to them in his second email. Docket 46 at 11-13. Alternatively, the magistrate judge found that Reiter independently had probable cause. *Id.* at 13-15. Roberts objects to both conclusions. Docket 53 at 3-6.

### A. Legal Standard

"The Fourth Amendment provides in relevant part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' " *Collins v. Virginia*, 138 S. Ct. 1663, 1669 (2018). The usual rule is that a reasonable search is one supported by probable cause and for which a warrant has been issued. *California v. Carney*, 471 U.S. 386, 390 (1985). The Supreme Court, however, has recognized exceptions to this rule where a reasonable search may occur without a warrant. *Id.* At issue in this case, "[t]he [Supreme] Court has held that the search of an automobile can be reasonable without a warrant." *Collins*, 138 S.Ct. at 1669. "[O]fficers may search an automobile without having

11

obtained a warrant so long as they have probable cause to do so." *Id.* at 1670.

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Kleinholz v. United States*, 339 F.3d 674, 676 (8th Cir. 2003) (citing *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)). Probable cause is "not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (cleaned up). To determine the existence of probable cause, the court "examine[s] the events leading up to the [search], and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "Probable cause may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if . . . some degree of communication exists between them." *United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000) (citing *United States v. Twiss*, 127 F.3d 771, 774 (8th Cir. 1997)).

### B. Englund Did Not Convey a Specific Finding of Probable Cause to the On-Scene Officers

Roberts objects to the conclusion that Englund had probable cause to search his vehicle. Docket 53 at 3-4. Because Englund was not one of the on-scene officers, whether Englund had probable cause only matters if Englund communicated this finding of probable cause to the on-scene officers in some

way. The magistrate judge concluded that Englund communicated this finding in his second email, which the on-scene officers read before the second robbery occurred. Docket 46 at 12-13.

Roberts objects to this conclusion because Englund's email said only that he was "close" to establishing probable cause. Docket 53 at 3. Englund testified that he thought he had probable cause at that time, despite saying otherwise in his email. Docket 45 at 60. There is no evidence, however, that the on-scene officers knew that Englund thought he had established probable cause at the time of his email. Thus, the court sustains Roberts' objection to the conclusion that Englund conveyed his finding of probable cause to other officers in his email.

Englund also testified that he communicated his finding of probable cause to Officer Neal after the officers stopped Roberts but before they searched his vehicle. *Id.* at 64. But Englund's testimony about this call differs from Neal's testimony. Neal testified that there was no discussion about probable cause during his call with Englund. *Id.* at 103. Neal testified that after giving Englund a brief update, he asked Englund whether he wanted them to search the vehicle. *Id.* According to Neal, he was trying to figure out whether Englund wanted the entire car preserved and towed to the evidence garage where an evidence technician would search the vehicle, or whether the officers could search it right there. *Id.* at 95-96, 103.

The court credits Neal's testimony about this call over Englund's testimony for two reasons. First, Englund's testimony contained at least one

13

other significant factual error about this phone call. In a supplemental report that Englund wrote the day after the vehicle search, Englund wrote that "Neal informed [him] that [Roberts] had all of the clothing in his vehicle that he had worn the previous night, which would have been from the robbery at the [Get-n-Go] . . . [and] that [Roberts] wore those same clothes as he robbed the Kum & Go that evening." Docket 44 at 3. Englund also testified that Neal told him this information about finding the clothing during the phone call before authorizing the search. Docket 45 at 66. But the video evidence and testimony from Klein and Neal establish that this clothing was found during the search of Roberts' car, which was after the phone call. *See* Exhibit A at 09:10-10:47; Exhibit D at 07:17-09:27; Docket 45 at 83, 103-04.

Second, the court has concerns about the credibility of Englund's testimony overall. Specifically, the magistrate judge credited Englund's testimony that he thought he had probable cause at the time of his second email, despite saying otherwise in the email. Docket 46 at 12. According to Englund, he said he was "close" because he wanted to go home, rather than spend a couple hours drafting a search warrant affidavit.[4] Docket 45 at 60-61.

---

[4] The magistrate judge credited Englund's testimony that he made this misrepresentation "to prevent an over-ambitious police officer from going out that evening to get the arrest." Docket 46 at 12. But Englund discussed being concerned about an overly ambitious officer only on direct examination. Docket 45 at 53. It was not until cross-examination that Englund disclosed that he thought he had probable cause at that time, and he justified saying otherwise because he wanted to go home and spend time with his family rather than spend a couple of hours writing a search warrant affidavit. Docket 45 at 60-61. He did not justify his decision to say he was "close" out of concern about an ambitious officer. *See id.*

14

But this explanation is not credible. As defense counsel pointed out and Englund admitted, had he said in his email that he had probable cause, there was nothing requiring him to seek a search warrant at that exact moment. *See id.* at 60-61. He would have been free to leave at the end of his shift. Additionally, if the court were to credit Englund's testimony about this, the court would be crediting the testimony of a police officer who admitted to lying about whether he thought there was probable cause in a department-wide email, which Reiter referred to as an "intel-update," for reasons of personal convenience. *See id.* at 16-17, 25, 34. Such an admission does not inspire confidence in the reliability of Englund's testimony.

For the foregoing reasons, the court credits Neal's testimony that there was no discussion of probable cause during his phone call with Englund, and the court modifies the Report and Recommendation to reflect that Englund never communicated a specific finding of probable cause to the on-scene officers. Because the court finds that Englund never communicated a finding of probable cause, it need not decide whether Englund developed probable cause to search Roberts' vehicle.

### C. The On-Scene Officers Had Probable Cause to Search Roberts' Vehicle

In addition to finding that Englund's probable cause finding was imputed to Reiter through Englund's email, the magistrate judge also found that "even without this email, Detective Reiter established his own probable cause to search Mr. Roberts' vehicle." Docket 46 at 13. In describing how Reiter established his own probable cause, however, the magistrate judge relied on

15

information from the email. *Id.* at 14. As Roberts points out, this conclusion is "flawed." Docket 53 at 5. It cannot be that Reiter developed probable cause independent of the email by relying on information that came only from that email. Roberts' objection to this conclusion is thus sustained. But the court need not evaluate whether Reiter and the other on-scene officers developed probable cause independent of Englund's email. The court's finding that Englund did not convey an actual finding of probable cause in the email does not mean that the on-scene officers could not rely on the specific information in the email in developing probable cause.

Roberts argues that the officers did not have probable cause because Englund's email stated that he had not yet established probable cause and "nothing about the facts of the second robbery . . . add any information to believe that the robber was Mr. Roberts—only that the same individual committed both robberies." *See* Docket 53 at 4. But because probable cause is "viewed from the standpoint of an objectively reasonable police officer," Englund's opinion about probable cause is not controlling. *See Pringle*, 540 U.S. at 371 (quoting *Ornelas*, 517 U.S. at 696). And as summarized below, the court finds that the officers did learn additional information after Englund's email that bolstered the belief that Roberts was the robber.

At the time of the search, the on-scene officers knew the following information: Through investigation, Englund had developed Roberts as a suspect in the Get-n-Go robbery. *See* Docket 43 at 4. They knew that Roberts was driving a gold 2004 Pontiac Grand Am, which matched the suspect's

16

vehicle as captured on a Get-n-Go camera, and they knew the license plate number for Roberts' car. *See id.* at 4, 8-9. After learning that Roberts was a suspect, Reiter reviewed previous booking photos of Roberts and believed that his stature, height, and weight matched the suspect he saw in Get-n-Go surveillance footage. Docket 45 at 19. The officers knew that the suspect in the Kum & Go robbery wore similar clothing (a red jacket or hoodie and blue ski mask) and drove a similar vehicle (gold or tan Grand Prix or Grand Am) as the suspect in the Get-n-Go robbery. Docket 43 at 2, 6-7, 12.

  Less than 10 minutes after the Kum & Go robbery, Reiter then observed a car matching the description and license plate of Roberts' car return to the vicinity of Roberts' address. *Id.* at 12; Docket 45 at 21-22. The officers knew that a Kum & Go robbery witness reported hearing the robber cock a gun. Docket 43 at 12. After Roberts was stopped, he told officers he had a gun in his vehicle, and officers saw a pistol magazine in plain view in his vehicle. Docket 45 at 24, 30, 36, 95. Reiter also testified that he identified Roberts as the driver of the vehicle based on his previous review of Roberts' booking photos. Docket 45 at 26. The court concludes that "given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence" of the gas station robberies would be found in Roberts' vehicle. *Kleinholz*, 339 F.3d at 676 (citing *Fladten*, 230 F.3d at 1085). Because the on-scene officers had probable cause to search Roberts' vehicle, the motion to suppress all evidence found during the vehicle search is denied.

## CONCLUSION

For the foregoing reasons, it is

ORDERED that

1. The portions of the Report and Recommendation (Docket 46) that were not objected to by either party are adopted in full.

2. Roberts' factual objections, his objection to the magistrate judge's conclusion that Englund communicated a finding of probable cause to the on-scene officers, and his objection to the magistrate judge relying on information from Englund's email to conclude that Reiter developed probable cause independent of that same email are sustained.

3. All Roberts' other objections are overruled, and Roberts' motion to suppress (Docket 31) is denied in full.

Dated April 21, 2023.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE